## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division (Greenbelt)

_____

| | |
|---|---|
| DR. MOTEE PERSAUD<br>2800 Wisconsin Avenue, N.W.<br>Apartment 303<br>Washington, DC 20007<br><br>          Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MARYLAND,<br>     UNIVERSITY COLLEGE<br>3501 University Boulevard East<br>Adelphi, Maryland 20783<br>Prince George's County,<br><br>Serve:<br><br>      Susan C. Aldridge, PhD<br>      Office of the President<br>      UMUC<br>      3501 University Boulevard East<br>      Suite 3130<br>      Adelphi, Maryland 20783<br><br>and<br><br>JOHN VOLPE<br>7307 Summit Avenue<br>Chevy Chase, Maryland 20815-4029<br>Montgomery County,<br><br>and<br><br>GREGORY L. VON LEHMEN<br>15300 Diamond Cove Terrace<br>Apartment 10<br>Rockville, Maryland 20850<br>Montgomery County,<br><br>          Defendants. | Civil Action No. _____ |

_____

## CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

1.        Dr. Motee Persaud ("Dr. Persaud"), who was born in Guyana (South America) of East Indian descent, was hired by the University of Maryland, University College ("UMUC") in September 1994.  At UMUC, he rose to the position of Director of the Global Business and Public Policy department, in which he was also a Collegiate Professor.  In December 2006, John Volpe ("Volpe") became Dr. Persaud's supervisor.  Volpe made numerous discriminatory and racist remarks in Dr. Persaud's presence about "foreigners" and African Americans.  In October 2007, Dr. Persaud confronted Volpe about his racist conduct.  Additionally, in November 2007, Dr. Persaud opposed UMUC's "diversity" plan during an all-staff meeting.  In December 2007, Volpe and Gregory Von Lehmen ("Von Lehmen"), Volpe's supervisor, retaliated against Dr. Persaud, and discriminated against him based on his race and national origin, by deciding to give Dr. Persaud a one-year contract extension, despite the fact that less qualified white and American colleagues received two-year extensions.  Volpe and Von Lehmen's actions violated 42 U.S.C. § 1981 and denied Dr. Persaud his right to freedom of speech under the First Amendment to the United States Constitution.

2.        In January 2008, Dr. Persaud filed an internal EEO complaint with UMUC based on the discriminatory denial of his two-year contract extension.  Volpe learned of the complaint and began a campaign of retaliatory harassment against Dr. Persaud, culminating in Volpe's decision to terminate Dr. Persaud's employment in December 2008.  The Defendant's decision to terminate Dr. Persaud, which was retaliatory and based on race and national origin discrimination, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981.

**Parties**

3.      Plaintiff Dr. Motee Persaud is a resident of the District of Columbia.  He resides at 2800 Wisconsin Avenue, N.W., Apartment 303, Washington, DC 20007.  At all times relevant to this action, Dr. Persaud was an "employee" of UMUC as that term is defined in 42 U.S.C. § 2000e(f), and an "employee" under Maryland common law.

4.      Defendant University of Maryland, University College ("UMUC") is a public institution of higher education and a constituent institution of the University System of Maryland.  Its principal place of business is 3501 University Boulevard East, Adelphi, Maryland 20783, which is located in Prince George's County.  At all times relevant to this action, UMUC was an "employer" that was "engaged in an industry affecting commerce" as those terms are defined in 42 U.S.C. § 2000(e)(b), and an "employer" under Maryland common law.

5.      Defendant John Volpe ("Volpe") is a resident of the state of Maryland.  He resides at 7307 Summit Avenue, Chevy Chase, Maryland, 20815-4029, which is located in Montgomery County.  He is currently the Assistant Dean for Business and Professional Programs at UMUC.

6.      Defendant Gregory Von Lehmen ("Von Lehmen") is a resident of the state of Maryland.  He resides at 15300 Diamond Cove Terrace, Apartment 10, Rockville, Maryland, 20850, which is located in Montgomery County.  He is currently the Provost and Chief Academic Officer at UMUC.

**Jurisdiction and Venue**

7.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), because this is an action arising under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

3

*seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

8.    Venue in this judicial district is appropriate because it is the judicial district where the unlawful employment practices are alleged to have been committed, it is the judicial district and division where the employment records relevant to the plaintiff's claims are maintained and administered, and because it is the judicial district and division in which the plaintiff would have worked but for the alleged unlawful employment practices.

9.    Venue in this judicial district is also appropriate pursuant to 28 U.S.C. § 1391 because it is the judicial district where each Defendant resides, all Defendants reside in the same state, and UMUC is subject to personal jurisdiction within the judicial district.  It is also the judicial district where a substantial part of the events or omissions giving rise to the claims occurred.

10.    Venue in this judicial division is appropriate because all defendants reside in the same judicial division, and UMUC has its principal place of business in this judicial division.  It is also the judicial division where a substantial part of the events or omissions giving rise to the claims occurred.

11.    Dr. Persaud timely filed complaints alleging discrimination and retaliation with the Maryland Commission on Human Relations, which forwarded the complaints to the United States Equal Employment Opportunity Commission ("EEOC") on or about June 30, 2009.  By the time that the defendants file an answer in this action, Dr. Persaud will have received a right to sue letter from the EEOC and, therefore, will have exhausted all administrative remedies required to bring the present action.

**Factual Allegations**

Dr. Persaud's Background and Achievements at UMUC

12.     Dr. Persaud was born on January 20, 1938 in Guyana (South America).  Dr.

Persaud's parents are of East Indian descent.  His race is South Asian and Hispanic (by federal

regulation).  His national origin is Guyanese.

13.     Dr. Persaud graduated from the University of Wisconsin (La Crosse), with a

degree in political science/sociology, in 1966.  In 1970, he earned an M.A. in Government from

Howard University.  In 1974, he earned a law degree from George Washington University.  In

May 1978, he received a Ph.D. in International Studies from American University.  Dr. Persaud

attended each institution on a full scholarship.

14.     He has more than thirty years of experience in business, academic, and public

policy positions.

15.     In 1994, Dr. Persaud accepted a position as the Academic Director of, and an

Associate Professor in, the Business Law and Public Policy program at UMUC.  In 2004, Dr.

Persaud was promoted to the position of Collegiate Professor (full professor).

16.     UMUC is a leader in providing online education in the global marketplace.  The

student body primarily consists of working adults, many of whom attend UMUC on a part-time

basis.  The school also caters to many students in the military who are stationed overseas.  The

average age of the undergraduate students is approximately 32 years.  Although approximately

40% of the University's students are minorities, minorities are underrepresented in faculty and

leaderships positions at the University.  UMUC has approximately 5,000 employees, including

faculty and staff, at its various campuses (including UMUC Europe and UMUC Asia).

17.     At UMUC, the School of Undergraduate Studies ("SUS") is organized into four

major academic units: Communications, Arts, and Humanities ("COMM"); Computer

Information Systems and Technology ("CITE"); Social Behavioral, Natural, and Mathematical

Sciences ("SCIP"); and the Business and Professional Programs ("BAPP").  Each of these units

is headed by an Assistant Dean who manages the various programs in the unit and who reports to

the Dean of SUS.  Each program within a unit is managed by an Academic Director who reports

to the Assistant Dean.  (As of 2008, BAPP consisted of a number of programs, including

Marketing, Accounting, Human Resource Management, Business Administration and

Management Studies, Economics and Finance, and Global Business and Public Policy.)

18.     Academic Directors' responsibilities include setting policy for their programs,

hiring faculty to teach the program's classes, mentoring the faculty, monitoring the performance

of faculty members (a number of whom are located in foreign countries), promoting effective

teaching, developing courses (in conjunction with the Instructional Development department),

handling student complaints, and teaching.  Since UMUC is not a research university,

researching and publishing scholarship are not job requirements.  The primary duties of

Academic Directors are teaching and administration of their programs.

19.     As of 1994, Dr. Persaud was the Academic Director for the Business Law and

Public Policy program.  Dr. Persaud inherited a program in which he supervised 10-15 faculty, 4

to 6 courses, and approximately 300 students.  Since then, Dr. Persaud has transformed this

relatively small program into a larger and more dynamic program

20.     Dr. Persaud was highly successful as an Academic Director.  In 2004, Dr. Persaud

conceived, designed, and developed a new program, known as Global Business and Public

Policy ("GBPP"), designed to study the intersection of business with public policy in the

international marketplace.  In order to have the program approved, UMUC had to submit Dr.

Persaud's proposal to the Maryland Higher Education Commission, which vetted the program

and approved it for UMUC.  The GBPP program was implemented at UMUC in the fall of 2004,

and was the first such program in the country.

21.     From the fall of 2004, which was the inception of the GBPP major, to the fall of

2008, the GBPP Department (comprising the new GBPP major, minors in Business Law and

Public Policy, and International Business) grew from approximately 2,000 students to over 4,000

students.  In 2004, GBPP Department had approximately 40 sections per semester; it grew to

over 85 sections by the fall of 2008.  (Although some courses are taught in the classroom,

approximately two-thirds of these classes were taught on-line.)  There were approximately 40

faculty members in the fall of 2004; by the fall of 2008, there were more than 75, over 95% of

whom had terminal degrees.

22.     Dr. Persaud also oversaw four "course chairs," who helped him supervise the

faculty and administer the program.  Since the majority of the classes in the program were taught

on-line, the faculty did not require offices but rather logged-in remotely as did the students they

taught.

23.     Dr. Persaud was well liked and respected by his faculty, as evidenced by their

consistently high attendance at faculty meetings, strong feedback, and support for the program's

vision.  The GBPP program generated a substantial amount of revenue for UMUC.

24.     The enhanced program that Dr. Persaud created not only offered a major in

Global Business and Public Policy, but also offered minors in Business Law and Public Policy,

and International Business.  Dr. Persaud managed these programs and courses.

25.     Dr. Persaud received consistently positive performance evaluations for his work as an Academic Director.

26.     Throughout his tenure, Dr. Persaud also was an excellent and popular teacher. (Dr. Persaud, who suffers from a hand tremor, did not teach classes online, but rather in person, frequently off-site at the University of Maryland, College Park campus.)  Dr. Persaud consistently received high marks on student evaluations, averaging over 4.80 on a five point scale for each period under review.  He was ranked in the top five percent among faculty for this metric.  The Dean recognized and commended Dr. Persaud for excellence in teaching performance, and UMUC students nominated Dr. Persaud for the Stanley J. Drazek Teaching Excellence Award numerous times in his tenure at UMUC.  He received over one hundred nominating letters from students over the course of his tenure at UMUC.

27.     Dr. Persaud was able to reach these achievements despite suffering discrimination and retaliation during (what would become) his final years at UMUC.

Dr. Persaud Initially Enjoyed a Good Working Relationship with Volpe

28.     From July to December 2006, Dr. Persaud worked under the direct supervision of Gregg Von Lehmen ("Von Lehmen"), who was the Interim Assistant Dean of Business and Management Studies.  Von Lehmen treated Dr. Persaud less favorably than his white and American colleagues.  Shortly after taking over as Assistant Dean, and despite the fact that Dr. Persaud and Von Lehmen previously had little interaction, Von Lehmen referred to Dr. Persaud as "combative."  Dr. Persaud accused Von Lehmen of "stereotyping" him and "singling him out" since white colleagues who spoke out during SUS meetings were complimented on their input. Von Lehmen hounded Dr. Persaud about projects he was working on and insisted that Dr. Persaud be in his office at a particular time, regardless of whether Dr. Persaud had work-related

reasons for not being present and even though Von Lehmen did not impose particular office

hours on Dr. Persaud's white and American colleagues.  When Dr. Persaud confronted Von

Lehmen and told him that his conduct violated EEO laws proscribing differential treatment, Von

Lehmen became hostile with Dr. Persaud and screamed at him in threatening tones.  Dr. Persaud

brought this incident to the attention of Roger Davis, then Associate Dean for Administrative

Affairs, and his assistant, Pam Risik (now Executive Assistant to Dean Marie Cini).  Davis

acknowledged that he was not surprised at Von Lehmen's behavior because he and (then) Dean

of SUS, Mary Ellen Hrutka, were aware that Von Lehmen had "serious personal issues."

29.     In December 2006, John Volpe was appointed Assistant Dean of Business

Administration and Professional Programs ("BAPP"), and became Dr. Persaud's direct

supervisor.  Von Lehmen became the Interim Dean of SUS, and Volpe's immediate supervisor.

30.     Dr. Persaud had helped Volpe obtain the position of Assistant Dean, and initially

enjoyed a good working relationship with him.

31.     In the spring of 2007, Volpe agreed with Dr. Persaud's favorable Performance

and Assessment Development ("PAD") for April 1, 2006 to March 31, 2007, which referenced

the "cutting edge" courses that Dr. Persaud was developing in conjunction with Europe and Asia.

32.     Moreover, Volpe accommodated the impact that the implementation of his own

priorities caused for Dr. Persaud's workload.  For example, in early 2007, the university began to

focus on assessment initiatives that were major UMUC priorities.  Volpe wanted Dr. Persaud to

focus on those activities in addition to administering the student learning proficiency

examination (MAPP) that was then in effect.

33.     On April 13, 2007, during a meeting with Dr Volpe, Dr. Persaud informed Dr.

Volpe that he may not be able to complete his course development activities because of the shift

toward assessment priorities.  Dr. Persaud also mentioned that his administrative workload was becoming overwhelming since the University had not hired a replacement for Robert Tipple, who served as the Assistant Academic Director for GBPP until he became Academic Director for Marketing and Business Supply Chain Management in the fall of 2006.  Thus, Dr. Persaud had been without an Assistant Academic Director for more than half a year.  Dr. Persaud noted that these administrative issues were impeding his ability to develop the courses referenced in his PAD.

34.     Volpe understood, and told Dr. Persaud to "do the best you can until we can find you some help."

35.     By September 2007, the University still had not hired an Assistant Director for Dr. Persaud, who continued to focus on assessment activities.  He told Volpe that he would not be able to develop any new courses as he was consumed by other priorities.  Volpe stated that he "completely understood" and told Dr. Persaud not to be concerned about it.  Volpe said, "There is always a next time" (i.e., in terms of submitting new courses to the Curriculum Committee).

36.     In the fall of 2007, Volpe hired Dr. Liliana Meneses as the Assistant Academic Director for GBPP and Human Resource Management.  Shortly after Meneses completed training, on November 26, 2007, Dr. Persaud met with Meneses and provided her with a "to do" list relating to numerous administrative duties, including assisting with "999" management (an online forum for faculty communications), handling student complaints, managing the student club, assisting with class visits, assisting with course chair management, faculty evaluations, and faculty application screening, and monitoring faculty presence.

Volpe Made Racist and Discriminatory Remarks

37.     Despite their solid working relationship, Dr. Persaud was disturbed by the

numerous discriminatory and racist remarks that Volpe made in his presence about "foreigners"

and African Americans.  When Dr. Persaud informed Volpe that he had lived in Jordan, Volpe

remarked that he doesn't like "those people" (i.e., Jordanians) and that he "can't trust them."

Volpe also recalled that a foreign doctor that he had seen in New York incorrectly diagnosed a

skin lesion as being cancerous.  Based on this experience, Volpe told Dr. Persaud that "most

foreign professionals are incompetent."

38.     In multiple conversations in February, March, and May 2007, when Dr. Persaud

and Volpe disagreed about United States politics or foreign policy, including its involvement in

Iraq, Volpe told Dr. Persaud that if he did not like United States policy, he should "go back to

Guyana."  Volpe made similar comments four or five times.

39.     On another occasion, in Dr. Persaud's presence, Volpe looked at a group of

Hispanic construction workers and remarked, "You are lucky to be here; you could be one of

those guys."  Several times, Volpe told Dr. Persaud that he should "go back to [his] country," or

that he would be "better off in Guyana."  In 2007 Volpe told Dr. Persaud more than once,

"You're better off retiring and will have a better time in Guyana."

40.     Volpe also disparaged African American students.  On several occasions in

March, May, June, August and September 2007, during one-on-one discussions in his

office about UMUC and its students, Volpe stated that African American students were lazy and

incompetent and said, "All they do is file student complaints hoping to get a better grade."

Volpe also made critical remarks about UMUC's open admission policy, stating that it

encouraged "ghetto Blacks" to enroll at UMUC.  Also, in July, September, and October of 2007,

in apparent reference to Barack Obama, Volpe said that African Americans "were unfit to

govern" and "would destroy this country."

41.     Dr. Persaud was uncomfortable with Volpe's racist remarks.  Not only was Dr.

Persaud himself a racial minority, but his girlfriend of twenty years was African American.

Given Volpe's derogatory comments about African Americans, Dr. Persaud feared revealing this

fact to Volpe.  Additionally, on at least three separate occasions in February, April and July of

2007, Volpe told Dr. Persaud about his experiences growing up in a poor Italian neighborhood in

the Bronx.  Volpe said that he knew members of the mafia, and that a cardinal rule in the

neighborhood was "you do not cross someone."

Dr. Persaud Opposed Volpe's Racist Conduct

42.     In October 2007, Dr. Persaud was in Volpe's office having a political discussion

with Volpe.  In apparent reference to Barack Obama, Volpe said that "black people" would "take

this country down."  Dr. Persaud said that he did not "appreciate [Volpe] bad mouthing" African

Americans and other minority groups.  He said, "Someday you'll be bad mouthing me."  Volpe

said, "You're different."  Dr. Persaud also told Volpe that he had been involved in the civil rights

movement (for African American rights).  Dr. Persaud then informed Volpe that his girlfriend of

twenty years was African American.  Volpe looked stunned.  Volpe said, "I need to be careful

what I say to you" and "I didn't realize you were one of them."  Dr. Persaud said, "I think you're

a racist" and left Volpe's office.

43.     Shortly after this exchange, during a (weekly) Department Faculty meeting, Volpe

remarked that two Academic Directors "would not be here in a couple years."  Dr. Persaud

followed Volpe back to his office.  He asked Volpe if he was referring to Dr. Persaud.  Volpe did

not respond, which Dr. Persaud understood as assent.

12

44.     On or around November 9, 2007, Dr. Persaud attended an all-staff meeting
(typically held once a semester) that included 60-70 administrators in SUS and representatives
from the larger UMUC community.  During a presentation to the group, the Vice President
of Strategic Planning stated that UMUC would hire foreign faculty to meet diversity
requirements.  The Vice President of Strategic Planning was Mark Carter, whom Von Lehmen
referred to as his brother in the introduction.  Dr. Persaud asked how UMUC could "justify
hiring foreign faculty to meet diversity" requirements when minority groups that were prevalent
in the outside community (African Americans in particular) were "not adequately represented" at
UMUC.  Additionally, Dr. Persaud questioned whether such a "diversity" strategy would comply
with State and EEOC mandates.  Dr. Persaud's white colleagues, including Von Lehmen and
Volpe, gave him severe looks after his question.  Dr. Persaud followed up his question by stating,
"I was not talking about 'global diversity but ethnic diversity.'"  Dr. Persaud noted more severe
looks from his white colleagues, including Von Lehmen and Volpe.

45.     After the meeting, a number of Dr. Persaud's minority colleagues, including Dr.
James, Davis and Ernesto Santos de Jesus ("Santos"), thanked Dr. Persaud for his questions.
They indicated that they had been afraid to speak up on the same issue (i.e., the priority the
University intended to give to foreign faculty over qualified minorities from the community).

Von Lehmen and Volpe Discriminated and Retaliated Against Dr. Persaud
By Giving Him Only a One Year Contract Renewal

46.     On December 5, 2007, Von Lehmen (the Interim Dean) and Volpe, met with Dr.
Persaud to discuss the renewal of his contract.  Dr. Persaud's (then) current contract, which was
a four-year contract, was set to expire on June 30, 2008.  In late September or early October
2007, per Volpe's request, Dr. Persaud had provided Volpe with extensive materials attesting to
his accomplishments during the term of the previous contract.

47.     Dr. Persaud waited outside the office where the meeting was held.  Volpe then came out to get him and said, "Be quiet.  Don't say anything."  Once Dr. Persaud was seated, Von Lehmen said, "We decided to give you a one year contract."  Dr. Persaud asked if that was the "standard" contract given to the other Academic Directors in the Department.  Von Lehmen said, "No.  Some got two or more years."  When Dr. Persaud asked why he had received only a one-year contract, Von Lehmen said, "Ask him," referring to Volpe.  Von Lehmen said, "Volpe recommended you for one year."  When Dr. Persaud asked Volpe why he had only received on year, Volpe said, "Lunchroom conversations."  Dr. Persaud said, "What lunchroom conversations?"  Volpe did not answer.  Dr. Persaud then looked at Von Lehmen, who seemed confused and unsatisfied by Volpe's answer.

48.     Volpe also claimed that Dr. Persaud had been "non-responsive" regarding "work issues."  When Dr. Persaud asked him for an example, Volpe claimed that Dr. Persaud had not imparted to his faculty a directive relating to proper grade distribution (a measure designed to control grade inflation).  Dr. Persaud noted, however, that he had spoken with his faculty about this issue at the fall 2007 faculty meeting, and that Dr. Persaud had forwarded to Volpe the minutes from this meeting.

49.     Volpe also claimed that Dr. Persaud had not developed any new courses.  Dr. Persaud reminded Volpe that Volpe had explicitly told Dr. Persaud that he could hold off on course development until he received assistance from a new Assistant Director (which happened only weeks before).  Additionally, Volpe had never indicated to Dr. Persaud that the term of his contract would depend on this issue; it never had in the past.  Volpe acknowledged, too, that other faculty had not developed new courses, either.

14

50.     Von Lehmen then asked Dr. Persaud to sign his new (one year) contract, but when he put the contract before Dr. Persaud, Dr. Persaud noticed that the signature line contained the name of Thomas G. Thompson, the Academic Director for Human Resource Management.

51.     Dr. Persaud's salary for the 2008-09 school year was listed as $96,499.  The contract was set to expire on June 30, 2009.

52.     The following morning, Dr. Persaud asked Robert Tipple, who was the Academic Director for Marketing and Business Supply Chain Management, and Thompson, the two other Academic Directors up for renewal, what length of contracts they had received.  Both said they had received two year contracts.  Tipple and Thompson are both white.  Tipple is Canadian; Thompson is American.  Tipple and Thomson were both less qualified for their positions. Thompson did not have a terminal degree in his field and, in fact, had been out sick for an extended portion of 2007.  Tipple had not obtained his terminal degree until he began teaching at UMUC.  Additionally, he was the Academic Director for Marketing, even though his area of expertise was technology.  Both men were Collegiate Associate Professors, not (full) Professors.

53.     Thompson encouraged Dr. Persaud to file a complaint against Volpe.

54.     Later that same day, Dr. Persaud approached Volpe and said, "I don't feel appreciated here."  When Volpe asked why, Dr. Persaud informed him that Tipple and Thompson had received two-year contracts, but Dr. Persaud had received a one-year contract. Volpe said, "Look.  Lie low.  Trust me.  I'll take care of you."  He added that next year, "Von Lehmen will not be here," thus suggesting to Dr. Persaud that Von Lehmen had made the decision on the length of his contract.

55.     In the days and weeks following the December 5, 2007 meeting, Dr. Persaud remained confused about why Von Lehmen and Volpe had decided to give Dr. Persaud a one-

year contract.  Dr. Persaud asked Volpe a number of times for a meeting so that they could

discuss what Dr. Persaud needed to do to receive a longer contract the following year.  Volpe

said that he was too busy to meet.

56.     Dr. Persaud was able to schedule an appointment with Von Lehmen.  On

December 20, 2007, Dr. Persaud met with Von Lehmen.  Dr. Persaud stated that he was upset

that he had received a one year contract when others had received two years, and that he felt he

had been treated "unfairly."  Dr. Persaud also stated that he was upset that Volpe had used

"lunch room conversations" as a basis for the decision.  Von Lehmen stated that he was

"uncomfortable" and "disturbed" himself about that rationale.  Confirming that Volpe had

proposed the one-year extension, Von Lehmen said that he would not overturn the decision

because he did not want to overturn "his Assistant Dean's decision."  But he indicated that he

was "open" to reconsidering it if Volpe wanted to change the decision.

57.     The same day, after the meeting, Dr. Persaud approached Volpe again about

having a meeting to discuss the one-year contract.  Dr. Persaud noted that Von Lehmen had told

Dr. Persaud to speak with him.  Volpe abruptly said, "Let's do it now, and get it over with."

58.     When Dr. Persaud again expressed his confusion over why he had received only a

one-year contract, Volpe repeated his earlier rationales.  Additionally, Volpe now claimed that

the decision had been based on Volpe's belief that Dr. Persaud was "negative," "critical" of

UMUC, "combative," seemed "unhappy," and "spent [his] time gossiping from office to office."

Volpe said that others who had talked to him shared these same perceptions.  Volpe again

mentioned an issue involving new course development.

59.     Dr. Persaud was stunned to hear that Volpe now seemed to be claiming that he had made the decision, as opposed to Von Lehmen, and that Volpe had listed a litany of vague reasons that he had never mentioned before.

60.     Dr. Persaud refuted the "grounds" that Volpe listed.  Dr. Persaud told Volpe that he had never told Dr. Persaud that a failure to develop new courses would affect his contract extension.  To the contrary, Volpe had told him not to worry about course development.  Dr. Persaud also told Volpe that since Volpe knew that Dr. Persaud was not going to have new courses ready, Volpe should have brought the course development issue to Dr. Persaud's attention sooner.  Dr. Persaud showed Volpe a list of cutting edge courses he was developing for submission to the Curriculum Committee.

61.     Dr. Persaud also asked why Volpe had recommended two year extensions for Tipple and Thompson.  Volpe said that Tipple had handled Thompson's program while the latter was out sick.  Volpe said that Thompson had developed a student club that was recognized by a national human resource organization, and that he had served on several committees.  These achievements seemed ancillary to the main goals of the position, particularly given Dr. Persaud's substantial achievements during the last contract term related to the core of his duties: program leadership, course development, and teaching.  Dr. Persaud not only had sterling student evaluations, but Dr.  Persaud reminded Volpe that he had built an innovative, first-of-its-kind program with high growth (almost tripling student enrollment and doubling the size of the faculty in the previous two years).  Dr. Persaud stated that it was unfair to select criteria arbitrarily to give "plus" consideration for Tipple and Thompson.  Dr. Persaud also stated that although he had requested that Volpe assign him to committees, Volpe had refused to do so, so it was inequitable and unfair for Volpe to hold committee service against him.

62.     Given the vague, unfounded, and false reasons that Volpe listed for the contract decision, and based on Volpe's earlier racist remarks and behavior, Dr. Persaud formed a reasonable belief that Volpe and Von Lehmen had discriminated against him based on his race and national origin.

<u>Dr. Persaud Filed an Internal EEO Complaint</u>

63.     On January 4, 2008, Dr. Persaud spoke with Ernesto Santos de Jesus ("Santos"), who as Director of Diversity Initiatives was responsible for investigating, resolving and monitoring internal discriminatory allegations to ensure compliance with equal employment opportunity laws.  During that conversation, Dr. Persaud recounted his December 5, 2007, and December 20, 2007 meetings with Von Lehmen and Volpe.  Santos encouraged Dr. Persaud to file a complaint of discrimination.  When Dr. Persaud indicated that he feared that Volpe would retaliate against him for filing an internal complaint, Santos assured him that it was "his job" to "investigate" complaints and "protect" employees who made them.

64.     On January 5, 2008, Dr. Persaud sent an email to Santos.  Dr. Persaud wrote that he had been subjected to "disparate treatment" with regard to his contract renewal.  He wrote: "Please accept this as an official notice of my complaint and intent to provide you with . . . more detailed information" pertaining to Dr. Persaud's meetings with Volpe and Von Lehmen.

65.     On January 24, 2008, Dr. Persaud provided this "more detailed information" to Santos.  In a nine-page complaint attaching other documents, Dr. Persaud asserted that Volpe and Von Lehmen had discriminated against him on the basis of race, national origin, stereotyping, and First Amendment rights with regard to his one-year contract renewal.  Dr. Persaud provided a lengthy recitation of the facts supporting his complaint, including a summary of the relevant meetings with Von Lehmen and Volpe, along with relevant documentation.  He

noted that he was a member of a minority group, that he was qualified for his position, that two other similarly-situated white directors were given two-year contract extensions, and that the University's reasons for the one-year contract were pre-textual.

66.     Based on this complaint, and despite the strong grounds for his claim of discrimination, Dr. Persaud asked only that the University reverse the one-year contract decision and provide him with a two year contract, which was the term of contract given to Dr. Persaud's white North American colleagues.

67.     The UMUC legal department ultimately received a copy of the complaint, as did the (new) Dean, Marie Cini.

68.     Santos conducted an "informal" investigation into Dr. Persaud's complaint. Santos met with Dr. Persaud and Volpe separately a number of times.  Santos also met with the newly appointed Dean, Marie Cini.

69.     In April 2008, Dr. Persaud, Santos, and Volpe had a lunch meeting to try to resolve the complaint.  Volpe acted very defensively and skirted Dr. Persaud's allegations regarding discriminatory treatment.  Santos was unable to resolve the complaint through his informal efforts.  Santos told Dr. Persaud that he would document the meeting with Volpe and continue to monitor Volpe's policies and actions.

70.     UMUC did not take any action as a result of Dr. Persaud's complaint.

71.     Santos informed Dr. Persaud numerous times that Nancy Williamson, an attorney in the legal department, repeatedly blocked his efforts to conduct an effective and formal investigation of Dr Persaud's complaint.

Volpe Retaliated Against Dr. Persaud For Filing the EEO Complaint

72.     In the wake of Dr. Persaud's complaint, Volpe subjected Dr. Persuad to an increasingly abusive work environment in retaliation for his complaint.  Volpe took a number of actions to punish Dr. Persaud for having filed an EEO complaint, including: (1) giving him a false performance evaluation; (2) impeding Dr. Persaud's ability to meet his new course development goals for the 2008-09 year; (3) yelling at Dr. Persaud; (3) seizing on problems with an online course revision to blame Dr. Persaud for problems that Volpe knew were not Dr. Persaud's responsibility; (4) contacting other people to "dig up" performance issues that Volpe could use to terminate Dr. Persaud; and (5) undermining Dr. Persaud's authority with regard to GBPP faculty.  Throughout these actions, Volpe often communicated with Dr. Persaud in an overtly hostile and aggressive way, including by yelling and screaming in what had formerly been a collegial environment and friendly relationship.  All of Volpe's actions were designed to force Dr. Persaud to resign or to set him up for termination – a strategy that failed since, although UMUC ultimately terminated Dr. Persaud, it never provided a reason for his termination.

73.     Volpe made no secret of the retaliatory animus that he had for Dr. Persaud.

74.     Volpe often mentioned to Dr. Persaud's colleagues that Dr. Persaud had filed a complaint against Volpe.  In those conversations, Volpe disparaged Dr. Persaud to his colleagues, including by saying that Dr. Persaud had failed to make the GBPP into a quality program – despite the abundant evidence to the contrary.  It was apparent to colleagues that Volpe was setting out to build a case against Dr. Persaud.

75.     In March or April 2008, Deloris James, the Assistant Academic Director for Business Administration and Management Studies, was in a meeting with Volpe and Spedden Hause, the Academic Director for Business Administration and Management Studies.  During

the meeting, Volpe mentioned Dr. Persaud's complaint and said, "How dare he file [a complaint] against me!"

### Volpe Gave Dr. Persaud a False Performance Evaluation

76.     On April 30, 2008, Volpe held a meeting with Dr. Persaud to discuss his evaluation ("PAD"). In previous years, the Assistant Dean (including Volpe, in 2007) had not made any changes to the evaluation, which is written by the Academic Director. During the 2008 evaluation meeting, Volpe sat behind his desk, with his feet up, thus positioning them in Dr. Persaud's face. Volpe held a file folder in front of his (own) face that appeared to contain Dr. Persaud's evaluation in it, although Volpe never showed Dr. Persaud the evaluation.

77.     Volpe stated that he had made only "minor changes" to the evaluation that Dr. Persaud had written, relating to three issues. First, Volpe criticized Dr. Persaud for not handling student complaints. Dr. Persaud informed Volpe that Harold Pittenger, Assistant Director (Academic Support), had been handling student complaints, which Volpe already knew. Dr. Persaud would handle them only if Pittenger brought particular complaints to Dr. Persaud's attention. Pittenger performed this same service, in the same manner, for other Academic Directors. Additionally, Volpe himself often complained that African American students merely made complaints to get a better grade in a particular class and the number of complaints rose dramatically at the end of the semester. Volpe did not respond to Dr. Persaud's explanation.

78.     Second, Volpe criticized Dr. Persaud for not logging onto the GBPP "student club" everyday. Dr. Persaud stated (as Volpe already knew) that he had delegated that task to Meneses, who received assistance from Margaret Cohen, the faculty coordinator for the club, and that Dr. Persaud was involved in the overall planning and direction of the club. Moreover, Shelly Hintz, Coordinator for Student Engagement in the Center of Student Success, managed

the student clubs.  Volpe did not insist that Dr. Persaud's white North American colleagues become involved in student clubs.  Again, Volpe did not respond to Dr. Persaud's explanation.

79.     Third, Volpe criticized Dr. Persaud for not going into "999," which was an on-line WEB forum for communicating with UMUC's faculty worldwide.  Dr. Persaud again explained that he had delegated that responsibility to Meneses (who performed the same role for Tom Thompson).  Volpe did not respond to this explanation.

80.     At the end of the meeting, Volpe handed Dr. Persaud the signature page to the evaluation, which had been folded in such a way that Dr. Persaud could not read the rest of the evaluation.  Volpe forced Dr. Persaud to sign the form, despite the fact that he had not shared its contents with Dr. Persaud, nor did Volpe provide Dr. Persaud with a copy of the evaluation, even though this was standard practice for evaluation meetings.  Thus, to the extent that Volpe made any revisions to Dr. Persaud's evaluation – which Dr. Persaud had written – Dr. Persaud has never seen them.

81.     On May 1, 2008, during a department faculty meeting, Volpe admitted that he did not "look in anyone's 999" or student club other than those run by Dr. Persaud.

<u>Volpe Obstructed Dr. Persaud's New Course Development</u>

82.     Volpe inserted himself into Dr. Persaud's course development activities, which was highly unusual for an Assistant Dean, particularly one whose specialty was Economics and thus did not match the courses being developed.  Volpe impeded Dr. Persaud's ability to develop the courses, and then blamed Dr. Persaud for failing to develop them.  During personal meetings on these subjects, Volpe often yelled at Dr. Persaud, insulted him (including by falsely accusing him of being "incompetent" or not knowing what Dr. Persaud was talking about), or abruptly terminating the meeting.

83.     On April 30, 2008, during Volpe's performance evaluation of Dr. Persaud (and finalization of his PAD for the following year), Dr. Persaud told Volpe that he would develop three new courses -- Global Business and Strategy, Global Markets and Policy, Global Finance and Banking Policy -- and a minor on Global Environmental Management and Policy.  Dr. Persaud was allowed to develop additionally a Global Business and Public Policy Minor, and make GBPP course Designation changes for submission to the Curriculum Committee as a package along with the new courses.  The PAD provided that Dr. Persaud would deliver this new course development package "in Summer 2008" with the explicit understanding between Volpe and Dr. Persaud that this would be at the end of August 2008 for submission to the Curriculum Committee.  These courses would ultimately be offered in 2009 or beyond.

84.     In June 2008, without prior discussion, Volpe sent Dr. Persaud an e-mail demanding that Dr. Persaud submit the new courses and other program changes in two weeks.  When Dr. Persaud reminded Volpe that the agreed delivery date was the end of August 2008, Volpe agreed to drop the Minor in Global Environmental Management Policy and to accept delivery of the following items: Global Business Strategy and Policy (GBPP 498), Global Finance and Banking Policy (GBPP 451), a minor on Global Business and Public Policy, and GBPP course designation changes.

85.     On the morning of July 7, 2008, two or three days prior to Volpe's stated deadline, Dr. Persaud emailed the materials to Volpe.  Volpe did not acknowledge that he had received the materials.  In the early afternoon, Dr. Persaud attempted to speak with Volpe to confirm he had received the new course materials, and to discuss them prior to submission to the Committee.  When Dr. Persaud approached Volpe, Dr. Persaud was extremely hostile.  He yelled and screamed at Dr. Persaud.  He said, "I just got it at 10 a.m.!  I've been in meetings all day!"

He said, "You want me to read it now!" and then noted that he still had two other meetings to attend.  Volpe falsely accused Dr. Persaud of not meeting Volpe's deadline.  Dr. Persaud was very upset and told Volpe that he had come to him in "good faith" to discuss his submission, and he did not appreciate the way Volpe yelled at him.

86.     On July 7, 2008 (at 2:47 p.m.), Dr. Persaud sent his new course materials to Cynthia Davis, who was Associate Dean for Academic Affairs and the Chair of the Curriculum Committee.  He wrote: "Would you be kind enough to include the attached documents on the agenda for the next curriculum committee meeting?  John has a busy schedule today but he and I will talk about the referenced items later.  Thanks."  The Curriculum Committee was scheduled to meet on July 31, 2008.  (Dr. Persaud's submissions were ahead of the Curriculum Committee's deadline of July 15, 2008.)

87.     On July 7, 2008 (at 3:48 p.m.), and despite the pressure Volpe had put on Dr. Persaud to submit the new course materials to him, Volpe sent an email to Davis: "I do not want these on the curriculum committee agenda until I've had a chance to read the material and reflect on it.  These decisions should not be made in haste.  If it becomes necessary, we will postpone the submission until the next curriculum committee meeting."

88.     Following this exchange, Dr. Persaud asked to meet with Volpe to discuss his submission, but Volpe put off Dr. Persaud by saying he was too busy and would let Dr. Persaud know when Volpe was ready to meet.  On numerous occasions, Volpe was overtly hostile toward Dr. Persaud.  Volpe yelled, "Don't you understand English!  I said I would get back to you."

89.     It was not until August 5, 2008, a full month after Volpe had pressured Dr. Persaud to submit the new course (and other) materials, that Volpe provided Dr. Persaud a response.  Rather than meet with him, as he said that he would, Volpe wrote Dr. Persaud a

24

lengthy email with a list of issues that needed to "be clarified, revised and/or addressed" prior to submission to the Committee.  In his email, he noted, "I've shared these issues with the chair of the Curriculum Committee, and she agrees with my concerns."  Dr. Persaud was shocked that Volpe had not included Dr. Persaud in any conversations with Davis about his materials.  Typically the Academic Director would present new courses to the Committee and answer any questions it had, and the Assistant Dean would support the Academic Director on an as needed basis.  Volpe had not only inserted himself into this process but also had ignored Dr. Persaud and addressed his problems directly with Davis, cutting Dr. Persaud out of the loop.  (Davis herself had no expertise in Global Business and Public policy.  Her expertise is English, and in British Literature.)

90.     The August 5, 2008 email from Volpe added, "The next Curriculum Committee meeting is scheduled for September 9, so there will be ample time for you to address these comments."  Later that same day, Dr. Persaud forwarded the proposal to the GBPP Academic Review Committee, which consisted of four faculty members in the GBPP program, to provide feedback on Volpe's response.

91.     Dr. Persaud informed Volpe that the Committee was reviewing Volpe's comments.   Volpe told Dr. Persaud to "take [his] time."

92.     On August 19 and August 21, 2008, Dr. Persaud asked to meet with Volpe to discuss the new course development issues.  Volpe said that he was too busy to meet but "we could do it later."  Volpe never indicated that there was any urgency to the issues that Dr. Persaud wished to discuss.

93.     On August 27, 2008, Volpe wrote Dr. Persaud an email in which he claimed that on August 5, 2008, he had "rejected" Dr. Persaud's proposals for course development.  Despite

the fact that Volpe's August 5, 2008 email provided Dr. Persaud until September 9, 2008 to provide responses, Volpe now demanded that Dr. Persaud provide him with a response by September 4, 2008.

94.     Dr. Persaud approached Volpe and reminded him that he needed to meet with him.  Volpe admitted that he "had forgotten" but that he was willing to meet on August 29, 2009 rather than receive a formal response on September 4, 2009.

95.     On August 29, 2008, Dr. Persaud met with Volpe to discuss new course submissions.  Volpe focused the discussion on the Global Finance and Banking Policy Course, and Volpe immediately adopted a very aggressive tone.  He sat with his feet on the desk and in Dr. Persaud's face and claimed that Dr. Persaud "did not know what [he] was talking about" (despite the fact that Volpe had no experience with global business or public policy).  Volpe also was very critical of the GBPP major as a whole.  He yelled and screamed at Dr. Persaud whenever he tried to logically challenge Volpe's position on issues pertaining to the courses. Finally, after abusing Dr. Persaud, Volpe reluctantly accepted Dr. Persaud's vision of the course. Volpe asked for only minor changes to the course.  Volpe remained very angry and hostile toward Dr. Persaud and abruptly cut short the meeting and -- only upon Dr. Persaud's urging – agreed to meet again to discuss the problems that Volpe purportedly had with the Global Business and Strategy course (GBPP 498) and the Global Business and Public Policy minor.

96.     Following the meeting, Dr. Persaud continued to ask Volpe to meet again to discuss any problems he had with the new courses.  Volpe put off Dr. Persaud.

97.     Finally, on September 12, 2008, Volpe agreed to meet.  Bootstrapping from his own delay, Volpe then accused Dr. Persaud of not meeting the September 9, 2008 Committee deadline.  Volpe was very aggressive during this meeting, and yelled at Dr. Persaud.  Volpe

abruptly told Dr. Persaud to drop the Global Business and Strategy course (GBPP 498), which was a course that Volpe had specifically asked Dr. Persaud to develop.  Thus, without any explanation and after Dr. Persaud had expended a considerable amount of time and effort on the course, Volpe instructed Dr. Persaud to make a waste of his own efforts.  Volpe was in a rush to leave and agreed to meet later.

98.     On October 7, 2008, Volpe and Dr. Persaud met briefly to discuss the PAD "Part 2" (Future Contributions 8/29/2008-3/03/09).  The PAD "Part 2" was a new SUS initiative to frame measurable employee goals (for the first time) for each employee.  During the meeting, Volpe gave Dr. Persaud approval to have as part of his PAD Part 2 the development of the Global Markets and Policy course.  Dr. Persaud alerted Volpe that this would take some time because there were no available texts, and Dr. Persaud would need to compile materials from available articles.  Dr. Persaud informed Volpe that they would likely have to wait until after the holidays to submit completed proposals to the Curriculum Committee.  Volpe agreed with that deadline.  The Global Markets and Policy course, along with the Global Environment and Management minor, and the course materials Dr. Persaud had already done (including the minor changes to Global Finance and Banking Strategy), were included in Dr. Persaud's PAD2 goals for submission to the next Curriculum Committee meeting, which was scheduled for after the holidays (in the spring semester).

99.     On October 20, 2008, Volpe emailed Dr. Persaud regarding his PAD2 goals.  In the email, and contrary to his prior agreements and discussions with Dr. Persaud, Volpe claimed that Dr. Persaud had not met the deadline that Volpe imposed for submission of the course materials in the summer of 2008.  Bootstrapping from Volpe's own delays, unfounded criticism,

27

and non-responsiveness, Volpe wrote: "I see the same courses/programs being mentioned six months later!"

100.    On October 24, 2008, Volpe signed off on Dr. Persaud's PAD2, incorporating the courses and programs Volpe and Dr. Persaud had talked about for submission to the next Curriculum Committee meeting after the holidays.

Online Course Revision and Development

101.    Volpe also falsely attacked Dr. Persaud's management of the revision process for two online courses -- Managing in the Public Sector (BMGT 366) and Global Business Management (BMGT 392) – and attempted to use it to set up Dr. Persaud for termination.

102.    In or around October 2006, two GBPP courses, Managing in the Public Sector (BMGT 366) and Global Business Management (BMGT 392), were authorized for online revision.  BMGT 366 and BMGT 392 were considered major revisions (to replace the content of what was then being offered online), which would take considerable time to complete.  These courses were still being taught during revision so UMUC did not lose any revenue during the revision process.

103.    Online revision, which is considered part of course development, is done through a team approach.  The team consists of a curriculum specialist, content expert, project Manager, editor, and reviewer.  The curriculum specialist, who typically is the Academic Director for the program in which the course will be given, conceptualizes the course and provides guidance to the content expert, who writes the course.  The curriculum specialist also reviews the content expert's work and provides feedback to the project manager.   In the cases of BMGT 392 and BMGT 366, Dr. Persaud was the curriculum specialist.

104.    The content expert, who is usually a faculty in the Academic Director's department, is the critical team member in terms of the substance of the course.  He or she writes whatever material will supplement the textbook for the course, if there is one, and will add value to the course.  His or her work is reviewed by the curriculum specialist, reviewer, the Project manager and the editor.  The content expert is paid an additional amount (aside from salary) for their services.

105.    The reviewer is usually a faculty member in the Academic Director's department. He or she is hired by the Academic Director and provides feedback on the content expert's work to the project manager.  The reviewer for BMG 366 was Liliana Meneses (Assistant Academic Director); the reviewer for BMGT 392 was Mike Nye (faculty in GBPP).

106.    Typically, the Office of Instructional Development ("OID") provides the project managers and editors.  The project manager organizes the initial meeting, establishes the work plan, including setting and modifying schedule and dates for deliverables agreeable to the course content expert, editor, curriculum specialist and reviewer.  Andrew Rein was the project manager for both BMGT 366 and BMGT 392.  In the case of BMGT 392 and 366, Rein was the one who would decide to modify the work schedule if necessary to accommodate the content expert.

107.    The editor, who is typically selected by the project manager, provides editorial inputs to the project manager and interfaces with the content expert to include changes approved by the curriculum specialist, the reviewer, and the project manager.

108.    Dr. Persaud's online revision team encountered major problems with content experts with regard to both BMGT 392 and BMGT 366.  A number of content experts either quit or were not asked to continue because they could not write to professional standards.  (Decisions

to pull someone off a project are made collectively by the project manager, curriculum specialist, the reviewer, and the editor.)

109.     In the case of Global Business Management (BMGT 392), Mary Beth Klinger, who served as content expert from October 2006 to August 2007, resigned after allegations of plagiarism surfaced against her.  (She had been interviewed and approved by Von Lehmen, who was then Acting Assistant Dean of BAPP).  The content expert who served in the fall of 2007 had writing problems, and the team decided to discontinue his contract.  The team then retained Mark Toplin, who served as the content expert from March to October 2008, when the project was completed.  Toplin encountered major problems keeping deadlines due to the illness of his father in Philadelphia.  Rein accommodated Toplin by extending his deadlines.  Volpe blamed Dr. Persaud for these delays.

110.     In the case of Managing in the Public Sector (BMGT 366), Christina Marine served as the content expert from October 2006 to December 2006.  She resigned because she was overwhelmed with work (she was also pursuing a PhD from a university in Romania).  Von Lehmen had interviewed and approved her.  Sarita Jackson, the content expert from February 2007 to August 2007, resigned due to family problems.  (Volpe had interviewed her and Von Lehmen had recommended her as a faculty.)  Spring Walton was the content expert briefly in the fall of 2007.  She was terminated for non production due to family problems and poor quality work.  Steve Henick was the content expert from March 2008 to October 2008.

111.     In the spring and summer of 2008, Volpe seized on these problems, for which Dr. Persaud was not at fault, to criticize Dr. Persaud's performance, and to attempt to set him up for termination.

112.    On July 8, 2008, Volpe contacted Henick to provide unfavorable information on Dr. Persuad.

113.    On August 5, 2008, Volpe sent Rein an email canceling BMGT 392 as an offering for the fall of 2008, despite the fact that Dr. Persaud and Rein had agreed to offer the course in the fall and had informed Volpe that the project was on target.  Volpe did not discuss this decision beforehand with Dr. Persaud (or Rein).  Volpe also asked Rein questions about Dr. Persaud.  Rein felt that Volpe was seeking information that he could use to build a case that Dr. Persaud was a poor performer.  Rein had responded to Volpe's request by clarifying that Dr. Persaud could not be blamed for the delay preparing new course information.  Rather, Rein informed Volpe, the content expert had encountered delays.

114.    On August 8, 2008, Volpe informed Dr. Persaud that Volpe had unilaterally decided to change the BMGT 392 course offering from the fall of 2008, which was the target date, to the spring of 2009, thus adding further delay and casting aspersions on Dr. Persaud.

115.    On September 17, 2008, Dr. Volpe demanded that Dr. Persaud provide Volpe with a schedule date for completion of the two online course revisions -- Managing in the Public Sector (BMGT 366) and Global Business Management (BMGT 392) -- even though Dr. Persaud had explicitly told Volpe that Mr. Rein was responsible for establishing schedule time tables and that they had been unable to keep to the schedule because of unforeseeable delays on the part of the content expert.  In this project, as Dr. Persaud informed Volpe, Dr. Persaud's role was limited as a curriculum specialist to providing conceptual structure, organization and review which was effectively executed.

116.    On September 18, 2008, Rein provided Dr. Volpe with the schedule for completion of the courses.  Rein wrote: "As the project manager for both of these courses

31

[BMGT 392 and BMGT 366] I can tell you we are making progress now.  It has been slower than I like but most of the delay at this point is caused by the content experts."

117.    On October 20, 2008, Volpe sent an email to Dr. Persaud.  Despite knowing that the problems with the online course revisions were not Dr. Persaud's fault, Volpe claimed that Dr. Persaud was "unable to manage this project properly."

118.    Both online revisions projects were completed in October 2008.

119.    After completing the projects, Dr. Persaud informed Volpe that he wanted to develop online a course on Global Commerce (BMGT 407), which Dr. Persaud had already developed and had been offering in the class room.  Dr. Persaud told Volpe he already had the necessary materials and a competent author in Henick, who had indicated that he would like to do the project.  Volpe refused, stating that he had no room for additional online courses.

120.    Yet, after Dr. Persaud's departure, Volpe authorized Tipple to develop the course online for spring 2009 with the help of Henick (and using the materials that Dr. Persaud had developed).  Thus, Volpe actively prevented Dr. Persaud from performing duties that would have provided him with academic recognition and success.

<u>Volpe's Other Acts of Harassment</u>

121.    Volpe also denied Dr. Persaud opportunities for service at UMUC.  During the spring of 2008, Dr. Persaud asked to be appointed to the Internationalization Committee -- which was a new committee studying the globalization of the curriculum, an area specialty for Dr. Persaud --  but Volpe told him that he could not appoint him to that committee because "no one wanted to work with [Dr. Persaud]."  Volpe's statement was false.  Dr. Persaud's relations with other faculty members were, in fact, excellent.

122.     Volpe also undermined Dr. Persaud's authority to lead the GBPP program.  Dr. Persaud had hired Nancy Williamson to teach in the GBPP department but she refused to be evaluated by the course chair, per the normal procedure in the department.  Dr. Persaud supported his course chair on the issue.  Williamson became upset.  Without consulting with Dr. Persaud, Volpe found her another position in the paralegal studies program.  This was in contravention of standard procedure in the department to have the Director of the hiring program -- in this case the Director of Paralegal Studies -- seek permission from the Director for whom the person teaches to ensure the shift does not interfere with the latter's ability to staff courses. Volpe simply bypassed the process, which negatively impacted Dr. Persaud's staffing.

123.     Volpe also used the services of Ms. Meneses, the Assistant Director for GBPP, thus undermining Dr. Persaud's ability to receive the kind of help that Assistant Directors provided to other Academic Directors.

124.     Volpe also refused to give Dr. Persaud credit for work that he had done.  For example, Volpe acknowledged a GBPP outreach brochure publicly but praised someone for it who had not participated in producing it.

125.     Volpe also failed to support or acknowledge the successes of Dr. Persaud's department, even as he touted lesser achievements by Dr. Persaud's white and American colleagues.  For example, on November 1, 2008, the GBPP program held a graduate dinner to facilitate collaboration between SUS and the Graduate School.  Susan Aldridge, UMUC President, as well as Dean Cini, attended the event, but Volpe failed to attend notwithstanding the fact that this was an important event promoted by SUS, the Graduate School, and UMUC.  In a faculty meeting on November 6, 2008, Tipple talked about the event and Volpe claimed to have "forgotten" about it.  Volpe did not acknowledge the event or thank Dr. Persaud for his

effort in putting it together, even as he learned from those in attendance that the event had been successful.

126.    Volpe also continued to engage in discriminatory conduct.  In October 2008, Dr. Persaud was in Volpe's office waiting to meet with him.  He observed that Volpe and Christina Gillihan, an Administrative Assistant in the Department, were watching and laughing at a youtube video, when he heard Ms. Gillihan state that Indian people were "as backward as their food."  She described in graphic terms how she got "diarrhea" from chicken curry.  Volpe laughed at her comments.  Dr. Persaud stated that he found the comments distasteful and disrespectful, and walked away.  After the meeting, Ms. Gillihan informed Dr. Persaud that she and Volpe had been watching a "dumb Indian video."

<u>UMUC Terminated Dr. Persaud Without Providing a Reason</u>

127.    In November 2008, Dr. Persaud told Santos that he believed Volpe had created a hostile and retaliatory work environment, and that he suspected that he was being set up for non-contract renewal and termination.  Santos said that he could not investigate the matter since he was a friend of both Dr. Persaud and Volpe.  Santos suggested that Dr. Persaud should voice his concerns to Santos's diversity counterpart (for UMUC) in Europe and Asia.  Dr. Persaud told Santos that his idea was neither feasible nor practical, but Santos said his hands were tied by the legal department given the strained relations that existed between them.  (Williamson, in particular, held a dim view of Dr. Persaud.  In addition to the course review conflict that arose between Dr. Persaud and Williamson, during Dr. Persaud's fall faculty meeting, on September 27, 2008, Williamson offended a number of faculty when she interrupted the meeting by demanding that everyone should leave to attend a separate meeting being held that morning.  Dr.

Persaud said that she could leave the faculty meeting any time she wanted but other faculty were welcome to stay as there was still time before the other meeting to discuss issues.)

128.    On December 22, 2008, Volpe and Jean Bielefeldt, Associate Vice President for Human Resources, met with Dr. Persaud and informed him that UMUC would not renew his contract for the 2009-10 academic year.  UMUC also placed Dr. Persaud on administrative leave (with pay) for the remaining six months of his contract (which was set to expire on June 30, 2009).

129.    Volpe then left the meeting and humiliated Dr. Persaud by informing all of the BAPP staff, whom he had assembled in a conference room, and BAPP faculty and administrators in the United States, Asia, and Europe, that Volpe had not renewed Dr. Persaud's contract.

130.    After Volpe had left the meeting, Dr. Persaud asked Bielefeldt the reason for UMUC's decision.  She responded that UMUC did not have an obligation to provide a reason for the termination because he was an at-will employee.  No one at UMUC has ever provided Dr. Persaud with a reason for his termination.

131.    Bielefeldt then informed Dr. Persaud that he was barred from returning to his office and that UMUC had terminated his computer access.  Thus, UMUC closed off Dr. Persaud's access to the personal belongings, information, and books that he had assembled during his fourteen year career at UMUC, as well as the numerous emails and documents on his computer that supported his complaint of discrimination and retaliation.  Bielefeldt said that Dr. Persaud should make an appointment to return to the building accompanied by someone from HR in order to collect his personal belongings.  Biefeldt also told Dr. Persaud he could no longer teach for UMUC.

132.     UMUC did not allow Dr. Persaud to return to his office and remove his belongings until January 24, 2009.  At that time, Heather Schalk, Director of HR for UMUC, supervised Dr. Persaud as he removed his belongings from his office.  During the visit, Dr. Persaud noticed that numerous books, personal belongings, and documents were missing from his bookshelves and desk.  When Dr. Persaud mentioned this to Schalk, she said that the missing items "may" have been university property.  In February 2009, Schalk refused to provide emails that Dr. Persaud requested.

133.     Following Dr. Persaud's termination, Volpe split the GBPP department into two: the Business Law and Public Policy Minor including Business Ethics courses were given to Dr. Deloris James (Assistant Director of Business Administration), who was made the Acting Academic Director for the Law program, and Global Business courses given to Dr. Robert Tipple (Director of Marketing).  James is African American; Tipple is a white Canadian.  Neither was as well qualified in these fields as Dr. Persaud.  Despite Dr. Persaud's stellar record as a teacher, Volpe instructed Dr. Tipple not to staff Dr. Persaud for any course because Dr. Persaud was barred from teaching at UMUC.

134.     Dr. Persaud was one of a number of individuals who Volpe considered for contract renewals in December 2008.  In 2008, Volpe considered contract extensions for six individuals within the business programs of the Business and Professional Studies department. Four of the individuals, including three white employees, received at least two-year contracts. (Thus, of the five white employees in the business program considered for renewal in 2007 and 2008 – two in 2007 and three in 2008 -- all five received at least two-year contracts.  Of the five American employees in the business program considered for renewal in 2007 and 2008 – one in 2007 and four in 2008 -- all five received at least two-year contracts.)

135.    Joseph Whelan, Chairman, Accounting, and Collegiate Associate Professor, received a two-year contract.  Whelan is a white American.

136.    Patricia Beckenholt, the Acting Academic Director, Economics and Finance, and Collegiate Associate Professor, received at least a two-year contract.  Ms. Beckenholt is a white American.  She had been hired in the fall of 2007, and does not have a terminal degree in her field.

137.    Katherine Sobieralski the Assistant Academic Director, Accounting, and Collegiate Associate Professor, received at least a two-year extension in December 2008.  She is a white American.  She was hired in 2007 and does not have a terminal degree.

138.    Deloris James, the Assistant Academic Director (Business Administration and Management Studies), received a two-year contract.  James is an African American.  (Volpe terminated James in October 2009.)

139.    The other employee in the business portion of the Business and Professional Studies Department not to be renewed was Edwin Mah, who was the Director of the Resource Center for Accounting and Finance, and a Collegiate Associate Professor.  Mah is Asian.

140.    Thus, the two employees to whom Volpe did not give two year contracts were Dr. Persaud, an East Indian of Guyanese descent, and Mah, an Asian individual.

141.    Volpe also gave at least two year extensions to two members of the professional studies group.  Jaylene Sarracino, assistant Academic Director, Criminal Justice, Investigative Forensics, and Legal Studies (and Collegiate Associate Professor) received at least two years.  William W. Sondervan, Academic Director, Criminal Justice, Investigative Forensics, and Legal Studies (and Collegiate Professor) also received at least two years.  Both employees are white and American.

142.    On January 5, 2009, Dr. Persaud spoke with Santos.  Santos said he had been unaware that UMUC had decided to terminate Dr. Persaud.  Santos remarked that "the environment around here seemed to be that whenever you file a complaint you are viewed as a troublemaker."

143.    On August 21, 2009, Dr. Persaud received a letter from the Maryland Unemployment Office (College Park Center) scheduling a phone interview for August 28, 2009 to resolve the issue of how Dr. Persaud was discharged from UMUC.  On August 26, 2009, Dr. Persaud received a phone call from a "Ms. Castro" from the Maryland Unemployment Office (College Park Center) to cancel the meeting.  Castro said that the issue of Dr. Persaud's discharge from UMUC had already been resolved and there was no need for the phone interview.  When Dr. Persaud asked her what reason UMUC had given for his discharge, she said "budgetary reasons."

**COUNT I**
**Unlawful Retaliation – Renewal of Contract**
**(As against Volpe and Von Lehmen in their <u>Official</u> Capacities)**
**<u>Ex Parte Young</u> – The Civil Rights Act of 1866, 42 U.S.C. § 1981**

144.    Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

145.    Dr. Persaud is a "person within the jurisdiction of the United States" under 42 U.S.C. § 1981.

146.    Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 when he opposed discriminatory conduct, including numerous racist remarks, by Volpe in October 2007.

147.    Dr. Persaud reasonably believed that Volpe's conduct constituted a violation of 42 U.S.C. § 1981.

148.    Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 on or around November 9, 2007, when he opposed the University's plan for complying with diversity requirements, and questioned whether such a strategy would comply with state and EEOC mandates.

149.    Dr. Persaud reasonably believed that the conduct that he opposed and the strategy that he questioned constituted a violation of 42 U.S.C. § 1981.

150.    Volpe and Von Lehmen knew that Dr. Persaud engaged in these instances of protected activity.

151.    On December 5, 2007, Volpe and Von Lehmen gave Dr. Persaud a one-year contract renewal, despite the fact that they provided two similarly situated colleagues of Dr. Persaud (who did not engage in protected activity) with two-year renewals.

152.    Volpe and Von Lehmen denied Dr. Persaud a two-year contract renewal because he had engaged in these protected activities.

153.    Volpe and Von Lehmen took these retaliatory actions under color of state law.

154.    Volpe and Von Lehmen's retaliatory actions denied Dr. Persaud the same right to make and enforce contracts that they provided to white citizens.

155.    Volpe and Von Lehmen's retaliatory actions constituted unlawful retaliation under federal law, specifically 42 U.S.C. § 1981.

156.    As a result of Volpe and Von Lehmen's violations of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

157.    Because Dr. Persaud is currently out of work as a result of the fact that he was renewed for one year as opposed to two years, Volpe and Von Lehmen's violation of federal law is ongoing.

158.    Volpe and Von Lehmen, individually and collectively, have the authority to reinstate Dr. Persaud to his position for the remainder of the second year that he would have been hired, absent their retaliatory conduct.

159.    Based on the above actions of Volpe and Von Lehmen, Dr. Persaud seeks prospective injunctive relief, including a declaratory judgment that Volpe and Von Lehmen violated Dr. Persaud's rights under 42 U.S.C. § 1981 by retaliating against him; reinstatement to his position for a second contract year; and any other injunctive relief that this Court deems just and equitable.

160.    Additionally, Dr. Persaud seeks reasonable attorney's fees, expert witness fees, and costs incurred in obtaining injunctive relief to remedy Volpe and Von Lehmen's actions.

**COUNT II**
**Unlawful Discrimination (Race) – Renewal of Contract**
**(As against Volpe and Von Lehmen in their <u>Official</u> Capacities)**
**<u>Ex Parte Young</u> – The Civil Rights Act of 1866, 42 U.S.C. § 1981**

161.    Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

162.    Dr. Persaud is a "person within the jurisdiction of the United States" under 42 U.S.C. § 1981.

163.    Dr. Persaud is East Indian and Hispanic.

164.    On December 5, 2007, Volpe and Von Lehmen gave Dr. Persaud a one-year contract renewal, despite the fact that they provided two similarly situated white colleagues of Dr. Persaud with two-year renewals.

165.     Dr. Persaud was performing the duties of his position and meeting the legitimate expectations of the position at the time that Volpe and Von Lehmen denied Dr. Persaud a two-year contract renewal.

166.     Volpe and Von Lehmen denied Dr. Persaud a two-year contract renewal because of Dr. Persaud's race.

167.     The reasons that Volpe and Von Lehmen provided for denying Dr. Persaud a two-year contract renewal were merely pretexts for racial discrimination.

168.     Volpe and Von Lehmen took these actions under color of state law.

169.     Volpe and Von Lehmen's actions denied Dr. Persaud the same right to make and enforce contracts that they provided to white citizens.

170.     Volpe and Von Lehmen's actions violated federal law, specifically 42 U.S.C. § 1981.

171.     As a result of Volpe and Von Lehmen's violations of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

172.     Because Dr. Persaud is currently out of work as a result of the fact that he was renewed for one year as opposed to two years, Volpe and Von Lehmen's violation of federal law is ongoing.

173.     Volpe and Von Lehmen, individually and collectively, have the authority to reinstate Dr. Persaud to his position for the remainder of the second year that he would have been hired, absent their discriminatory conduct.

174.     Based on the above actions of Volpe and Von Lehmen, Dr. Persaud seeks prospective injunctive relief, including a declaratory judgment that Volpe and Von Lehmen

violated Dr. Persaud's rights under 42 U.S.C. § 1981 by denying him the same contract rights enjoyed by white employees; reinstatement to his position for a second contract year; and any other injunctive relief that this Court deems just and equitable.

175.     Additionally, Dr. Persaud seeks reasonable attorney's fees, expert witness fees, and costs incurred in obtaining injunctive relief to remedy Volpe and Von Lehmen's actions.

**COUNT III**
**Retaliation for Exercise of Free Speech – Renewal of Contract**
**(As against Volpe and Von Lehmen in their <u>Official</u> Capacities)**
**<u>Ex Parte Young</u> -- The Civil Rights Act of 1871, 42 U.S.C. § 1983**

176.     Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

177.     On or around November 9, 2007, at an all-staff meeting in front of a large segment of the UMUC community, Dr. Persaud engaged in activity protected under the First Amendment to the United States Constitution when he opposed the University's plan for complying with diversity requirements, and questioned whether such a strategy would comply with state and EEOC mandates.

178.     In taking these actions, Dr. Persaud spoke as a citizen on a matter of public concern.

179.     Dr. Persaud's actions did not interfere with the University's ability to provide effective and efficient services to the public, and thus his interest in expression on this matter of public concern outweighed the employer's interest in providing effective and efficient services to the public.

180.     On December 5, 2007, Volpe and Von Lehmen gave Dr. Persaud a one-year contract renewal, despite the fact that they provided two similarly situated colleagues of Dr. Persaud (who had not exercised rights under the First Amendment) with two-year renewals.

181.    Volpe and Von Lehmen denied Dr. Persaud a two-year renewal contract because of his exercise of his First Amendment right to freedom of speech on or around November 9, 2007.

182.    Volpe and Von Lehmen took this action under color of state law.

183.    Volpe and Von Lehmen's action violated federal law, specifically 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.

184.    As a result of Volpe and Von Lehmen's violation of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

185.    Because Dr. Persaud is currently out of work as a result of the fact that he was renewed for one year as opposed to two years, Volpe and Von Lehmen's violation of federal law is ongoing.

186.    Volpe and Von Lehmen, individually and collectively, have the authority to reinstate Dr. Persaud to his position for the remainder of the second year that he would have been hired, absent their retaliatory conduct.

187.    Based on the above actions of Volpe and Von Lehmen, Dr. Persaud seeks prospective injunctive relief, including a declaratory judgment that Volpe and Von Lehmen violated Dr. Persaud's rights under the First Amendment to the United States Constitution by retaliating against him for the exercise of his free speech rights; reinstatement to his position for a second contract year; and any other injunctive relief that this Court deems just and equitable.

188.    Additionally, Dr. Persaud seeks reasonable attorney's fees, expert witness fees, and costs incurred in obtaining injunctive relief to remedy Volpe and Von Lehmen's actions.

## COUNT IV
### Unlawful Retaliation – Renewal of Contract
### (As against Volpe and Von Lehmen in their <u>Individual</u> Capacities)
### The Civil Rights Act of 1866, 42 U.S.C. § 1981

189.     Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

190.     Dr. Persaud is a "person within the jurisdiction of the United States" under 42 U.S.C. § 1981.

191.     Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 when he opposed discriminatory conduct, including numerous racist remarks, by Volpe in October 2007.

192.     Dr. Persaud reasonably believed that Volpe's conduct constituted a violation of 42 U.S.C. § 1981.

193.     Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 on or around November 9, 2007, when he opposed the University's plan for complying with diversity requirements, and questioned whether such a strategy would comply with state and EEOC mandates.

194.     Dr. Persaud reasonably believed that the conduct that he opposed and the strategy that he questioned constituted a violation of 42 U.S.C. § 1981.

195.     Volpe and Von Lehmen knew that Dr. Persaud engaged in these instances of protected activity.

196.     On December 5, 2007, Volpe and Von Lehmen gave Dr. Persaud a one-year contract renewal, despite the fact that they provided two similarly situated colleagues of Dr. Persaud (who did not engage in protected activity) with two-year renewals.

197.     Volpe and Von Lehmen denied Dr. Persaud a two-year contract renewal because he had engaged in these protected activities.

198.    Volpe and Von Lehmen took these retaliatory actions under color of state law.

199.    Volpe and Von Lehmen's retaliatory actions denied Dr. Persaud the same right to make and enforce contracts that they provided to white citizens.

200.    Volpe and Von Lehmen's retaliatory actions constituted unlawful retaliation under federal law, specifically 42 U.S.C. § 1981.

201.    The rights to enjoy the same contract rights as white citizens under 42 U.S.C. § 1981 and to be free from retaliation for opposing conduct made unlawful by 42 U.S.C. § 1981 were clearly established rights of which a reasonable person would have known at the time that Volpe and Von Lehmen decided to give Dr. Persaud a two-year contract renewal.

202.    As a result of Volpe and Von Lehmen's violations of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

203.    Volpe and Von Lehmen's retaliation against Dr. Persaud was done with malice and with a reckless disregard for Dr. Persaud's rights under federal law.

204.    For violations of 42 U.S.C. § 1981, Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. § 1981, including, but not limited to, the following:

    a.  injunctive relief;
    b.  reinstatement;
    c.  economic damages including back pay;
    d.  compensatory damages;
    e.  actual expenses;
    f.  compensation for humiliation and embarrassment; and
    g.  punitive damages;
    h.  reasonable attorney's fees, expert witness fees, and costs; and
    i.  any other relief that this Court deems just and equitable including front-pay, and pre-judgment interest.

**COUNT V**
**Unlawful Discrimination (Race) – Renewal of Contract**
**(As against Volpe and Von Lehmen in their <u>Individual</u> Capacities)**
**The Civil Rights Act of 1866, 42 U.S.C. § 1981**

205.     Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

206.     Dr. Persaud is a "person within the jurisdiction of the United States" under 42 U.S.C. § 1981.

207.     Dr. Persaud is East Indian and Hispanic.

208.     On December 5, 2007, Volpe and Von Lehmen gave Dr. Persaud a one-year contract renewal, despite the fact that they provided two similarly situated white colleagues of Dr. Persaud with two-year renewals.

209.     Dr. Persaud was performing the duties of his position and meeting the legitimate expectations of the position at the time that Volpe and Von Lehmen denied Dr. Persaud a two-year contract renewal.

210.     Volpe and Von Lehmen denied Dr. Persaud a two-year contract renewal because of Dr. Persuad's race.

211.     The reasons that Volpe and Von Lehmen provided for denying Dr. Persaud a two-year contract renewal were merely pretexts for racial discrimination.

212.     Volpe and Von Lehmen took these actions under color of state law.

213.     Volpe and Von Lehmen's actions denied Dr. Persaud the same right to make and enforce contracts that they provided to white citizens.

214.     Volpe and Von Lehmen's actions violated federal law, specifically 42 U.S.C. § 1981.

215.    The right to enjoy the same contract rights as white citizens under 42 U.S.C. § 1981 was a clearly established right of which a reasonable person would have known at the time that Volpe and Von Lehmen decided to deny Dr. Persaud a two-year contract renewal.

216.    As a result of Volpe and Von Lehmen's violations of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

217.    Volpe and Von Lehmen's discrimination against Dr. Persaud was done with malice and with a reckless disregard for Dr. Persaud's rights under federal law.

218.    For violations of 42 U.S.C. § 1981, Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. § 1981, including, but not limited to, the following:

    a.   injunctive relief;
    b.   reinstatement;
    c.   economic damages including back pay;
    d.   compensatory damages;
    e.   actual expenses;
    f.   compensation for humiliation and embarrassment; and
    g.   punitive damages;
    h.   reasonable attorney's fees, expert witness fees, and costs; and
    i.   any other relief that this Court deems just and equitable including front-pay, and
         pre-judgment interest.


**COUNT VI**
**Retaliation for Exercise of Free Speech – Renewal of Contract**
**(As against Volpe and Von Lehmen in their <u>Individual</u> Capacities)**
**The Civil Rights Act of 1871, 42 U.S.C. § 1983**

219.    Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

220.    On or around November 9, 2007, at an all-staff meeting in front of a large segment of the UMUC community, Dr. Persaud engaged in activity protected under the First

47

Amendment to the United States Constitution when he opposed the University's plan for complying with diversity requirements, and questioned whether such a strategy would comply with state and EEOC mandates.

221.    In taking these actions, Dr. Persaud spoke as a citizen on a matter of public concern.

222.    Dr. Persaud's actions did not interfere with the University's ability to provide effective and efficient services to the public, and thus his interest in expression on this matter of public concern outweighed the employer's interest in providing effective and efficient services to the public.

223.    On December 5, 2007, Volpe and Von Lehmen gave Dr. Persaud a one-year contract renewal, despite the fact that they provided two similarly situated colleagues of Dr. Persaud (who had not exercised rights under the First Amendment) with two-year renewals.

224.    Volpe and Von Lehmen denied Dr. Persaud a two-year renewal contract because of his exercise of his First Amendment right to freedom of speech on or around November 9, 2007.

225.    Volpe and Von Lehmen took this action under color of state law.

226.    Volpe and Von Lehmen's action violated federal law, specifically the First Amendment of the United States Constitution.

227.    The right to be free from retaliation because of the exercise of the First Amendment right to freedom of speech was a clearly established right of which a reasonable person would have known at the time that Volpe and Von Lehmen decided to deny Dr. Persaud a two-year contract renewal.

228.    As a result of Volpe and Von Lehmen's violation of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

229.    Volpe and Von Lehmen's retaliation against Dr. Persaud was egregious and taken in conscious disregard of or with deliberate indifference to Dr. Persaud's rights under the First Amendment to the Constitution and 42 U.S.C. § 1983, and was done outrageously, wantonly, and oppressively with legal and actual malice.

230.    For violations of 42 U.S.C. § 1983, Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. § 1983, including, but not limited to, the following:

   a.  injunctive relief;
   b.  reinstatement;
   c.  economic damages including back pay;
   d.  compensatory damages;
   e.  actual expenses;
   f.  compensation for humiliation and embarrassment; and
   g.  punitive damages;
   h.  reasonable attorney's fees, expert witness fees, and costs; and
   i.  any other relief that this Court deems just and equitable including front-pay, and pre-judgment interest.

## COUNT VII
### Unlawful Retaliation -- Termination
### (As against UMUC)
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.

231.    Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

232.    Dr. Persaud is an "employee" as that term is defined in 42 U.S.C. §2000(e).

233.    UMUC is an "employer" engaged in an "industry that affects commerce" with the statutorily required number of employees as those terms are defined in 42 U.S.C. §2000(e).

234.    Dr. Persaud engaged in protected activity under Title VII when he opposed discriminatory conduct, including numerous racist remarks, by Volpe in October 2007.

235.    Dr. Persaud reasonably believed that Volpe's conduct constituted a violation of Title VII.

236.    Dr. Persaud engaged in protected activity under Title VII on or around November 9, 2007, when he opposed the University's plan for complying with diversity requirements, and questioned whether such a strategy would comply with state and EEOC mandates.

237.    Dr. Persaud reasonably believed that the conduct that he opposed and the strategy that he questioned constituted a violation of Title VII.

238.    In January 2008, Dr. Persaud engaged in protected activity under Title VII when he opposed conduct that he reasonably believed constituted race and national origin discrimination by filing an internal EEO complaint with UMUC with regard to Von Lehmen's and Volpe's decision to give him only a one-year contract.

239.    In January 2008, Dr. Persaud engaged in protected activity under Title VII when he participated in an internal grievance procedure to remedy what Dr. Persaud reasonably believed was race and national origin discrimination with regard to Von Lehmen's and Volpe's decision to give him only a one-year contract.

240.    Volpe, Von Lehmen, and other relevant decision makers at UMUC knew that Dr. Persaud had engaged in these instances of protected activity.

241.    UMUC terminated Dr. Persaud's employment on December 22, 2008.

242.    UMUC terminated Dr. Persaud because he had engaged in protected activity under Title VII, and thus UMUC engaged in unlawful retaliation.

243.     Dr. Persaud suffered economic and non-economic damages, including emotional distress and reputational harm, as a result of UMUC's unlawful conduct.

244.     UMUC's retaliation against Dr. Persaud was done with malice and with a reckless disregard for Dr. Persaud's rights under federal law.

245.     For violations of the Civil Rights Act of 1964 - Title VII, 42 U.S.C. § 2000e-3(a), and pursuant to § 42 U.S.C.§ 2000e-5(g)(1), Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to, the following:

    a.  injunctive relief;
    b.  reinstatement;
    c.  economic damages including back pay;
    d.  compensatory damages;
    e.  actual expenses;
    f.  compensation for humiliation and embarrassment; and
    g.  punitive damages;
    h.  reasonable attorney's fees, expert witness fees, and costs; and
    i.  any other relief that this Court deems just and equitable including front-pay, and pre-judgment interest.

## COUNT VIII
### Unlawful Discrimination (Race) -- Termination
### (As against UMUC)
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.

246.     Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

247.     Dr. Persaud is an "employee" as that terms is defined in 42 U.S.C. §2000(e).

248.     UMUC is an "employer" engaged in an "industry that affects commerce" with the statutorily required number of employees as those terms are defined in 42 U.S.C. §2000(e).

249.     Dr. Persaud is East Indian and Hispanic.

250.    Dr. Persaud was performing the duties of his position and meeting the legitimate expectations of UMUC.

251.    UMUC terminated Dr. Persaud's employment on December 22, 2008.

252.    UMUC terminated Dr. Persaud's employment because of Dr. Persuad's race.

253.    UMUC did not provide a reason for Dr. Persaud's termination, and any such reason is a pretext for racial discrimination.

254.    UMUC did not terminate similarly-situated white employees.

255.    Following his termination, UMUC distributed Dr. Persaud's former duties to employees who were not East Indian or Hispanic.

256.    Dr. Persaud suffered economic and non-economic damages, including emotional distress and reputational harm, as a result of UMUC's unlawful conduct.

257.    UMUC's discrimination against Dr. Persaud was done with malice and with a reckless disregard for Dr. Persaud's rights under federal law.

258.    For violations of the Civil Rights Act of 1964 - Title VII, 42 U.S.C. § 2000e-2(a), and pursuant to § 42 U.S.C.§ 2000e-5(g)(1), Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to, the following:

        a.  injunctive relief;
        b.  reinstatement;
        c.  economic damages including back pay;
        d.  compensatory damages;
        e.  actual expenses;
        f.  compensation for humiliation and embarrassment; and
        g.  punitive damages;
        h.  reasonable attorney's fees, expert witness fees, and costs; and
        i.  any other relief that this Court deems just and equitable including front-pay, and pre-judgment interest.

**COUNT IX**
**Unlawful Discrimination (National Origin) -- Termination**
**(As against UMUC)**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.**

259.    Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

260.    Dr. Persaud is an "employee" as that terms is defined in 42 U.S.C. §2000(e).

261.    UMUC is an "employer" engaged in an "industry that affects commerce" with the statutorily required number of employees as those terms are defined in 42 U.S.C. §2000(e).

262.    Dr. Persaud was born in Guyana and is Guyanese.

263.    Dr. Persaud was performing the duties of his position and meeting the legitimate expectations of UMUC.

264.    UMUC terminated Dr. Persaud's employment on December 22, 2008.

265.    UMUC terminated Dr. Persaud's employment because of Dr. Persuad's national origin.

266.    UMUC did not provide a reason for Dr. Persaud's termination, and any such reason is a pretext for national origin discrimination.

267.    UMUC did not terminate similarly-situated American and North American employees.

268.    Following his termination, UMUC distributed Dr. Persaud's former duties to employees who were not Guyanese.

269.    Dr. Persaud suffered economic and non-economic damages, including emotional distress and reputational harm, as a result of UMUC's unlawful conduct.

270.    UMUC's discrimination against Dr. Persaud was done with malice and with a reckless disregard for Dr. Persaud's rights under federal law.

271.    For violations of the Civil Rights Act of 1964 - Title VII, 42 U.S.C. § 2000e-2(a), and pursuant to § 42 U.S.C.§ 2000e-5(g)(1), Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. §2000(e) *et seq.* including, but not limited to, the following:

      a.  injunctive relief;
      b.  reinstatement;
      c.  economic damages including back pay;
      d.  compensatory damages;
      e.  actual expenses;
      f.  compensation for humiliation and embarrassment; and
      g.  punitive damages;
      h.  reasonable attorney's fees, expert witness fees, and costs; and
      i.  any other relief that this Court deems just and equitable including front-pay, and pre-judgment interest.

## COUNT X
### Unlawful Retaliation -- Termination
### (As against Volpe in his <u>Individual</u> Capacity)
### The Civil Rights Act of 1866, 42 U.S.C. § 1981

272.    Dr. Persaud incorporates the allegations contained in all of the foregoing paragraphs as though fully alleged herein.

273.    Dr. Persaud is a "person within the jurisdiction of the United States" under 42 U.S.C. § 1981.

274.    Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 when he opposed discriminatory conduct, including numerous racist remarks, by Volpe in October 2007.

275.    Dr. Persaud reasonably believed that Volpe's conduct constituted a violation of 42 U.S.C. § 1981.

276.    Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 on or around November 9, 2007, when he opposed the University's plan for complying with diversity

requirements, and questioned whether such a strategy would comply with state and EEOC mandates.

277.    Dr. Persaud reasonably believed that the conduct that he opposed and the strategy that he questioned constituted a violation of 42 U.S.C. § 1981.

278.    Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 in January 2008, when he opposed conduct that he reasonably believed constituted race and national origin discrimination by filing an internal EEO complaint with UMUC with regard to Von Lehmen's and Volpe's decision to give him only a one-year contract.

279.    Dr. Persaud engaged in protected activity under 42 U.S.C. § 1981 in January 2008 when he participated in an internal grievance procedure to remedy what Dr. Persaud reasonably believed was race and national origin discrimination with regard to Von Lehmen's and Volpe's decision to give him only a one-year contract.

280.    Volpe knew that Dr. Persaud engaged in these instances of protected activity.

281.    On December 22, 2008, Volpe terminated Dr. Persaud's employment.

282.    Volpe terminated Dr. Persaud's employment because Dr. Persaud had engaged in the protected activities listed above.

283.    Volpe took this retaliatory action under color of state law.

284.    Volpe's retaliatory action denied Dr. Persaud the same right to make and enforce contracts that he provided to white citizens.

285.    Volpe's retaliatory action constituted unlawful retaliation under federal law, specifically 42 U.S.C. § 1981.

286.    The rights to enjoy the same contract rights as white citizens under 42 U.S.C. § 1981 and to be free from retaliation for opposing conduct made unlawful by 42 U.S.C. § 1981

were clearly established rights of which a reasonable person would have known at the time that

Volpe terminated Dr. Persaud's employment.

287.    As a result of Volpe's violation of federal law, Dr. Persaud has suffered economic

and non-economic damages, including lost salary, emotional distress and reputational harm, and

will continue to suffer such harms.

288.    Volpe's retaliation against Dr. Persaud was done with malice and with a reckless

disregard for Dr. Persaud's rights under federal law.

289.    For violations of 42 U.S.C. § 1981, Plaintiff is entitled to such legal or equitable

relief as will effectuate the purposes of 42 U.S.C. § 1981, including, but not limited to, the

following:

      a.  injunctive relief;
      b.  reinstatement;
      c.  economic damages including back pay;
      d.  compensatory damages;
      e.  actual expenses;
      f.  compensation for humiliation and embarrassment; and
      g.  punitive damages;
      h.  reasonable attorney's fees, expert witness fees, and costs; and
      i.  any other relief that this Court deems just and equitable including front-pay, and
         pre-judgment interest.

### COUNT XI
### Unlawful Discrimination (Race) -- Termination
### (As against Volpe in his <u>Individual</u> Capacity)
### The Civil Rights Act of 1866, 42 U.S.C. § 1981

290.    Dr. Persaud incorporates the allegations contained in all of the foregoing

paragraphs as though fully alleged herein.

291.    Dr. Persaud is a "person within the jurisdiction of the United States" under 42

U.S.C. § 1981.

292.    Dr. Persaud is East Indian and Hispanic.

293.    On December 22, 2008, Volpe terminated Dr. Persaud's employment.

294.    Dr. Persaud was performing the duties of his position and meeting the legitimate expectations of the position at the time that Volpe terminated his employment.

295.    Volpe terminated Dr. Persaud because of Dr. Persuad's race.

296.    Neither Volpe nor anyone else provided a reason for Dr. Persaud's termination, and any such reason is a pretext for racial discrimination.

297.    Volpe did not terminate similarly-situated white employees.

298.    Following his termination, Volpe distributed Dr. Persaud's former duties to employees who were not East Indian or Hispanic.

299.    Volpe took this action under color of state law.

300.    Volpe's termination of Dr. Persaud denied Dr. Persaud the same right to make and enforce contracts that Volpe provided to white citizens.

301.    Volpe's termination of Dr. Persaud violated federal law, specifically 42 U.S.C. § 1981.

302.    The right to enjoy the same contract rights as white citizens under 42 U.S.C. § 1981 was a clearly established right of which a reasonable person would have known at the time that Volpe decided to terminate Dr. Persaud.

303.    As a result of Volpe's violation of federal law, Dr. Persaud has suffered economic and non-economic damages, including lost salary, emotional distress and reputational harm, and will continue to suffer such harms.

304.    Volpe's discrimination against Dr. Persaud was done with malice and with a reckless disregard for Dr. Persaud's rights under federal law.

305.    For violations of 42 U.S.C. § 1981, Plaintiff is entitled to such legal or equitable relief as will effectuate the purposes of 42 U.S.C. § 1981, including, but not limited to, the following:

     a.  injunctive relief;
     b.  reinstatement;
     c.  economic damages including back pay;
     d.  compensatory damages;
     e.  actual expenses;
     f.  compensation for humiliation and embarrassment; and
     g.  punitive damages;
     h.  reasonable attorney's fees, expert witness fees, and costs; and
     i.  any other relief that this Court deems just and equitable including front-pay, and pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Honorable Court for judgment against UMUC, Volpe, and Von Lehmen, in the amount of economic, compensatory, and punitive damages to be determined at trial, a declaratory judgment and injunctive relief, plus attorneys' fees, costs of this action, and any other relief this Honorable Court deems just and proper to award.

Dr. Motee Persaud
By Counsel

/S/ David L. Scher
_____
R. Scott Oswald, Esquire (D. Md. Bar No. 25391)
David L. Scher, Esquire (D. Md. Bar No. 17187)
The Employment Law Group, P.C.
888 17th St. NW, Suite 900
Washington, D.C. 20006
(202) 261-2802 (telephone)
(202) 261-2835 (facsimile)
 @employmentlawgroup.com
 @employmentlawgroup.com
*Counsel for Plaintiff*

## **JURY DEMAND**

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

/S/

David L. Scher